UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

OGEECHEE-CANOOCHEE RIVERKEEPER, INC.,

Plaintiff,

v.                                            606CV102

UNITED STATES ARMY CORPS OF
ENGINEERS; LT. GENERAL CARL A. STROCK,
United States Army Corps of Engineers; COLONEL
MARK S. HELD, United States Army Corps of
Engineers, Savannah District; MIRIAN
MAGWOOD, United States Army Corps of
Engineers, Savannah District,

Defendants.

# ORDER

## I. INTRODUCTION

Ogeechee-Canoochee Riverkeeper, Inc. ("Riverkeeper") brought this Administrative Procedure Act ("APA") claim against the U.S. Army Corps of Engineers and various Corps officers in their official capacities (collectively, the "Corps").[1] Doc. # 1; 5 U.S.C. §§ 701-706 (APA judicial review section). Riverkeeper challenges a Corps decision to exempt a proposed timber harvest from Clean Water Act ("CWA") regulation as "arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with the law." Doc. # 1 at 6, 12-15 (citing 5 U.S.C. § 706(2)(A) (relevant APA provision)); 33 U.S.C. §§ 1251-1387 (CWA).

## II. BACKGROUND

### A. Procedural Background

Cypress Lake is a several-hundred acre, man-made, wooded lake created sixty years ago in Bulloch County, Georgia. Doc. # 1 at 7. Cypress Lake, Inc. ("CLI"), the private company that owns the lake, sought to harvest timber from 60 of the lake's acres. Id. at 7-8. On 10/25/06, the Corps made an "Exemption Determination" that the harvest proposed in CLI's submitted "Forest Management Plan" was exempt from CWA regulation; "this proposed harvesting operation would be normal on-going silviculture[2] and would not be subject to regulation under Section 404 of the Clean Water Act (33 of the Code of Federal Regulations Part 323.4(a)(1))." Id., exh. 5 (footnote added).

Riverkeeper then brought this action, contesting the Corps's Exemption Determination as an arbitrary and capricious application of the "on-going silviculture" exemption from CWA compliance. Id. at 12-14. Even if the silviculture exemption applies, Riverkeeper contends, the Corps arbitrarily and capriciously failed to apply the CWA's "recapture" provision.[3]

---

[1] A private-company defendant, Cypress Lake, Inc., was dismissed after settlement. Doc. # 18.

[2] Silviculture is "[t]he scientific practice of establishing, tending, and reproducing forest stands with desired characteristics. It is based on the knowledge of tree characteristics and environmental requirements." http://www.gfc.state.ga.us/Resources/Publications/Educational/glossary.pdf (site as of 5/27/08). The previous definition and site cited in the Court's 5/7/07 Order (doc. # 26) is no longer available online.

[3] This provision prevents

> [a]ny discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

33 U.S.C. § 1344(f)(2).

Subsequently, CLI abandoned its plan to harvest the 60 acres at issue, and Riverkeeper agreed to dismiss CLI as a defendant. Doc. ## 17-18. The settlement agreement provided that "[CLI] no longer intends to *presently* pursue the proposed timber harvested [sic] outlined in its request to the Corps ... the Corps has advised [CLI] that the [Exemption Determination] is no longer valid." Doc. # 17 at 2. The Corps's subsequent motion to dismiss (doc. # 19) for lack of subject matter jurisdiction on mootness grounds was denied. Doc. # 26 (finding that a reasonable basis existed to believe the voluntarily ceased Exemption Determination will recur).

Currently before the Court are Riverkeeper's and the Corps's cross-motions for summary judgment. Doc. ## 37, 43. Riverkeeper is sticking to its guns -- it claims that the Corps's Exemption Determination was arbitrary and capricious and contrary to applicable law. Doc. # 37 at 1. The Corps, in contrast, insists its determination was not. Doc. # 43.

**B. Clean Water Act (CWA)**

Except when in compliance with certain other sections, the CWA § 301(a) prohibits "the discharge of any pollutant by any person" into navigable waters. 33 U.S.C. § 1311(a). "Discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source...." 33 U.S.C. § 1362(12)(A). "Pollutants" include, *inter alia*, dredged spoil, biological material, rock and sand. 33 U.S.C. § 1362(6). But CWA § 404 allows the Corps to "issue permits ... for the discharge of dredged or fill material into the navigable waters at specified disposal sites." The harvesting of trees from Cypress Lake would most likely involve the discharge of pollutants into navigable waters under the statute -- thus necessitating a permit.

However, CWA § 404(f) created narrow exemptions to the permit program. A relevant exemption here is for "the discharge of dredged or fill material ... from *normal* farming, silviculture, and ranching activities such as ... harvesting for the production of ... forest products." 33 U.S.C. § 1344(f) (emphasis added). To qualify as "normal," the activities "must be part of an established (*i.e.*, on-going) farming, silviculture, or ranching operation...." 33 C.F.R. § 323.4(a)(1)(ii); 40 C.F.R. § 232.3(c)(1)(ii)(A). "Ongoing" activities by definition must have occurred in the past:

> Activities on areas lying fallow as part of a conventional rotational cycle are part of an established operation. Activities which bring an area into farming, silviculture, or ranching use are not part of an established operation.

33 C.F.R. § 323.4(a)(1)(ii); 40 C.F.R. § 232.3(c)(1)(ii)(B). The parties agree that to be "on-going" silviculture, the operation must continue into the future. In other words, the affected parcel must be tended so as to foster specific tree regeneration (as opposed to simply harvesting trees with no view to managing forest-regrowth and simply awaiting ordinary and thus random vegetative growth). Doc. # 37 at 10; doc. # 43 at 16.

The focus of the inquiry here, then, is whether the Corps acted arbitrarily and capriciously in determining that the proposed harvest was part of an on-going silviculture operation, and thus entitled to an exemption. That, in turn, directs the inquiry to whether the landowner will genuinely pursue methods to reasonably assure tree regeneration.

2

## C. Factual Background[4]

In 6/05, the Corps received a proposal to harvest 60 acres of timber from a portion of Cypress Lake. Doc. # 37, AR 001. The area to be harvested contained water tupelo trees, cypress trees, and black gum trees. *Id.*, AR 044. An existing spillway structure (controlling the water level) was opened to substantially lower the water so that these trees could be cut (they normally stood in water). *Id.*, AR 018.

The Corps exchanged letters with the Cypress Lake owners and their agents. Two documents emerged: the Harvest Plan[5] (describing how the timber will be harvested) and the Forest Management Plan (describing post-harvest land management). Most of the issues in this case arise from The Forest Management Plan (FMP); the parties disagree over what measures are necessary for the trees to regenerate after harvest.

The AR contains three different versions of the FMP; the first two were superseded by the third.[6] *Id.* The first FMP, received by the Corps on 7/3/06, provides:

> The timber will be harvested above the high water mark to insure regeneration via coppice stump sprout for a future stand

(The Practice of Silviculture, 1962). Doc. # 43, AR 026. "Regeneration via coppice stump sprout" means the forest will regenerate through sprouts coming from cut stumps. *See* http://www.gfc.state.ga.us/Resources/Publications/Educational/glossary.pdf (site as of 5/27/08) ("A forest stand originating primarily from stump sprouts; the coppice method refers to the way these forests are regenerated. Hardwood species typically reproduce by coppicing; pines do not have the ability to sprout from cut stumps").

The Corps forwarded the 7/3/06 plan to Tom Welborn, Chief of the Wetlands, Coastal and Nonpoint Source Branch of Region 4 of EPA[7] (doc. # 43 at 59), asking if the proposed plan would be exempt. *Id.*, AR 033. Based on issues with cypress tree regeneration under similar environmental conditions in Louisiana, Welborn responded that he shared the information with EPA headquarters and they needed time to discuss the issue "based on what is going on in [Louisiana]...." *Id.*, AR 038.

Shortly thereafter, the Southern Environmental Law Center (SELC) submitted a letter to the Corps expressing its belief that the proposed harvest required a § 404 permit and the FMP lacked proper measures to provide reasonable assurance that the water tupelo and cypress trees would regenerate after harvest. Doc. # 37, AR 043-046. According to the SELC, recent research showed that both cypress and water tupelo fail to regenerate when they are inundated:

---

[4] All facts have been culled from the Administrative Record ("AR") in this matter, *see Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996) ("The focal point for judicial review of an administrative agency's action should be the administrative record"), and thus there are no disputed material facts.

[5] The Harvest Plan is not at issue in this suit.

[6] Each FMP has the same 6/29/06 date on it but Corps's records show that the Corps received them on three separate dates.

[7] EPA divided the country into 10 regional offices. Georgia is located in Region 4. http://www.epa.gov/epahome/where.htm (site as of 5/27/08).

3

Research in swamp systems in the southeast shows that cypress and water tupelo regenerate well under the proper conditions where low water is maintained for a sufficient time to allow seedlings to grow tall enough to maintain some of their foliage above subsequent floodwaters during the growing season. The proper conditions include a good seed crop available at the time of harvest, abundant overhead light, little competition from other species, and a very moist, but not flooded, seed bed. [¶] ... Cypress trees cannot germinate in standing water and do not grow tall enough during short drawdown periods to survive subsequent flooding. Reliability of water tupelo in inundated environments is equally questionable.

*Id.*, AR 044. Thus the FMP was inadequate because it failed to require that the lake's water level remain lowered until seedlings were well above the high water mark.

The letter also shed light on the Louisiana situation Welborn referenced *supra*. It stated:

Natural regeneration of cypress trees has typically been poor to non-existent in areas in south Louisiana following logging mainly because the swamps in that region were hydrologically altered and remained flooded for much of the year.

*Id.* The SELC referenced a letter from EPA Region 6 (which includes Louisiana) to the Corps office in New Orleans regarding a proposed cypress logging operation in a Louisiana swamp. That letter emphasized that prolonged inundation may severely limit natural regeneration of cypress trees and thus required more active management measures such as "providing for replanting in areas where inundation restricts regeneration over time." *Id.*, AR 048-049.

These letters prompted the Corps to meet with members of the Georgia Forestry Commission[8] (GFC) and the EPA. The following determinations were reached: (1) "the regulation's reference to on-going meant that trees would regenerate"; (2) "regeneration of trees meant that the tree stumps harvested would re-sprout"; and (3) "additional information was required in order to make an exemption determination in this case." Doc. # 43, AR 053.

The Corps then requested more information from the GFC which, after it was received, was deemed inconclusive. Ultimately, the Corps asked the GFC to request the owners of Cypress Lake to "mod[ify] their forest management plan to assure regeneration through stump sprout." *Id.* The GFC would then review the modified FMP and relay its comments to the Corps. *Id.*

Thus, the second FMP was submitted to the Corps on 9/5/06, and it stated:

The timber will be harvested approximately one foot above the high water mark, as per [GFC], to insure regeneration via coppice stump sprout for a future stand (The Practice of Silviculture, 1962). The water level on the lake will be kept down until sprouting is at least 12 inches above the high water level.

*Id.*, AR 028. This FMP therefore added a water-

---

[8] "The Georgia Forestry Commission (GFC) is a dynamic state agency responsible for providing leadership, service, and education in the protection and conservation of Georgia's forest resources." http://www.gfc.state.ga.us/AboutUs/AboutUs.cfm (site as of 5/27/08).

level requirement to assure regeneration.

Subsequently, the GFC sent its opinion on the second FMP to the Corps and concluded:

> In order to address the concern of regeneration and ongoing forestry, the revised plan states that the timber will be harvested approximately one foot above the high water mark and that the water level will be kept down until natural regeneration is twelve inches above the normal high water level. According to available literature and recent field observations in Louisiana and Florida, gum and cypress trees will regenerate naturally by seed and coppice from stump sprouts. [K]eeping the water level down, until such time this expected seed and coppice regeneration is twelve inches above the normal high water level, should be sufficient to meet the ongoing forestry definition and exemption.

Doc. # 37, AR 057. The GFC thus made it clear that, to assure regeneration, the water level must be kept down until "seed *and* coppice regeneration is twelve inches above the normal high water level."

The Corps then received a third FMP on 9/26/06 (after the GFC's letter was submitted). This final FMP superseded the other two and simply stated:

> The timber will be harvested approximately one foot above the high water mark, as per [GFC], to insure regeneration via coppice stump sprout for a future stand [cite omitted]. The [GFC] will monitor the site after harvesting to document regeneration.

*Id.*, AR 030. This final FMP, then, omitted the water level requirement and added an ambiguous GFC monitoring commitment.

A final site visit arranged by the Corps with members of the EPA (including Welborn) and members of the GFC (*not* including the employee who wrote the GFC's letter discussed *supra*, AR 057) occurred on 10/17/06. A summary of that visit concluded:

> On-site discussion supported the proposed activity being exempt as on-going silviculture (and that the trees would regenerate through stump sprouts). [GFC] agreed to monitor regeneration for future reference in these types of situations. EPA agreed to provide the Corps with some more information regarding their opinion on the proposed activity as soon as possible but was not able to give a date.

Doc. # 43, AR 128.

Thus, without explanation, the FMP removed the water level requirement and the Corps summarily concluded that the proposed activity (in the third FMP) would be exempt as on-going silviculture. Of note is the EPA's offer to provide more information regarding its opinion on the matter, but the EPA could not offer a specific date on which that information would be provided.

Also during this site visit, Welborn took photos to establish the existence of previous tree harvesting from Cypress Lake. Doc. # 43 at 50. Two pictures show a total of three stumps. Doc. # 37, AR 131. Welborn claims another photograph (doc. # 37, AR 129) "shows stumps from previous harvesting closer to the spillway structure." Doc. # 47 at 50. The Court detects no stumps in this picture, and the photo fails to focus on anything in particular. While

5

Welborn's statements are not part of the AR, the Court will take his sworn declaration as an accurate explanation of what the picture purports to show. *See Preserve Endangered Areas of Cobb's History, Inc.*, 87 F.3d at 1246 n. 1 (11th Cir. 1996) (courts generally are not empowered to go outside the AR but may do so when materials explain subjects in it). Based on these stumps, Welborn was of the opinion that there had been previous tree harvests in this area, thus attempting to satisfy the retrospective element of "on-going silviculture," doc. # 47 at 50-51 (recall that "on-going silviculture" places proposed activities under a CWA § 404(f) exemption to the CWA-based permit program).

The Corps issued its Exemption Determination based on that third FMP, which only required harvesting trees one foot above the water level (with regeneration solely by coppice stump sprout) and provided for some GFC post-harvest monitoring. Doc. # 37, AR 133-134. The AR is devoid of any additional information from the EPA, and in fact the Corps made its decision just 8 days after this site visit (thus the Corps did not wait for any more EPA input before making its decision). Doc. # 37, AR 133. This lawsuit followed shortly thereafter.

## III. ANALYSIS

The APA provides the applicable standard of review in this case. *See* 5 U.S.C. §§ 701-706 (APA judicial review section). This Court may set aside agency action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review is narrow "and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quotes and cite omitted). "A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974).

Agency action will be considered arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. But a court must still "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

Riverkeeper challenges three specific aspects of the Corps' Exemption Determination: (1) there was past silviculture at this site; (2) the trees will regenerate under the current FMP; and (3) the proposed activity does not fall under the CWA's 404(f)(2) "recapture" provision. Doc. # 37.

### A. Past Silviculture

As previously stated, "on-going" silviculture must have occurred in the past. "Activities on areas lying fallow as part of a conventional

rotational cycle are part of an established operation. In contrast, activities which bring an area into farming, silviculture, or ranching use are *not* part of an established operation." 33 C.F.R. § 323.4(a)(1)(ii) (emphasis added).

The Corps relies on Welborn's photographs of stumps and his declaration that it "is but one example of stumps from previous harvesting in the portion of Cypress Lake from which Cypress Lake, Inc., contemplated harvesting trees." Doc. # 43 at 15; *id.*, AR 131; *id.* at 50. Welborn also referenced another picture that purported to show stumps from previous harvesting in another portion of the lake.[9] *Id.* at 50 (referencing AR 129). He further declares that tupelo and cypress forests have a very long rotation (50 or 60 years) before they are harvestable. *Id.* at 51. Hence, the fact "[t]hat the [AR] does not contain further evidence of previous harvesting is not surprising." *Id.* Neither Welborn's declaration nor the Corps' briefs refer to evidence of *past silviculture*, only previous harvesting. Essentially the Corps equates "previous harvesting" with past silviculture. *Id.* at 15; doc. # 48 at 3.

Riverkeeper unsurprisingly responds that the "mere presence of stumps" is insufficient evidence of an on-going *silviculture* operation. Doc. # 45 at 4. These trees, as Riverkeeper points out, could have been cut for any number of reasons (canoe paths, improving views from houses, improving habitats for hunting or fishing). *Id.* at 6. Riverkeeper also emphasizes that the AR "is devoid of any evidence that the owners of Cypress Lake took any deliberate action to manage or maintain the growth of the trees." *Id.* at 5. According to Riverkeeper, establishing past *silviculture* requires evidence of both previous harvesting and efforts to *regrow* the forest.

The Corps nestles in the deferential standards provided to agency actions while emphasizing that Welborn is an EPA agency expert who viewed the evidence at Cypress Lake as indicative that previous harvesting occurred there. Doc. # 48 at 3-4. His expert opinion combined with the stump photos, the Corps contends, establishes a "rational connection between the facts found and the choice made." *Id.* at 4 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Even allowing for substantial deference to the Corps's expert opinion that previous harvesting occurred, the question still remains: does mere previous harvesting equate to past silviculture? Thus this Court is presented with an issue of an agency's implicit interpretation of a statute. *See Long Island Care at Home, Ltd. v. Coke*, 127 S.Ct. 2339, 2349 (2007) ("Where ... an agency's course of action indicates that the interpretation of its own regulation reflects its considered views ... we have accepted that interpretation as the agency's own, even if the agency set those views forth in a legal brief").

The Supreme Court has stated, "if the statute speaks clearly to 'the precise question at issue,' we 'must give effect to the unambiguously expressed intent of Congress.'" *Barnhart v. Walton*, 535 U.S. 212, 217 (2002) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984)). "If, however, the statute is silent or ambiguous with respect to the specific issue, we must sustain the Agency's interpretation if it is based on a permissible construction of the Act." *Id.* at 218 (quotes and cite omitted).

---

[9] Again, the Court discerns no such stumps but since the photo was taken at a distance, the Court will take Welborn's representations as accurate.

7

Furthermore, "[c]ourts grant an agency's interpretation of its own regulations considerable legal leeway." *Id.* at 217. "[T]he agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994).

Here, CWA § 404(f) clearly lists "normal ... silviculture" as an exemptable operation. But neither the statute, the Corps, nor the EPA has defined "silviculture." The Corps's regulation does state that to qualify as "normal" silviculture, the activities "must be part of an established (i.e., on-going) ... silviculture ... operation...." 33 C.F.R. § 323.4(a)(1)(ii). As evidenced by the dispute in this case, this regulation requires that the trees regenerate to constitute *on-going* silviculture. The agency's own regulation requires efforts to regenerate and reestablish the forest to constitute silviculture, just like the definition the Court quoted *supra* n. 2 (Silviculture is "[t]he scientific practice of *establishing, tending, and reproducing* forest stands with desired characteristics. It is based on the knowledge of tree characteristics and environmental requirements" (emphasis added)).

In other words, if harvesting alone (without subsequent efforts to regenerate the forest) constituted "normal" silviculture, then the activity would not be an "on-going" silviculture operation as required by the Corps's regulation. To constitute past silviculture, there must also be evidence of past efforts to regenerate the forest or evidence that the standing forest is a product of someone's past endeavors. The AR lacks any evidence of past efforts by anyone to reestablish this forest at Cypress Lake, or any explanation by the Corps showing why this forest is part of an on-going silviculture operation (as opposed to a naturally standing forest from which some trees were cut in the past).

Accordingly, the agency's interpretation in this case that evidence of previous harvesting *alone* constitutes past *silviculture* is plainly inconsistent with its regulation, 33 C.F.R. § 323.4(a)(1)(ii). Consequently, its decision -- that evidence of previous harvesting at Cypress Lake was sufficient to satisfy the retrospective element of "on-going" silviculture -- was arbitrary and capricious and must be overturned.

But, to be clear, the Court expresses no opinion on whether there was past silviculture at this site. Simply put, the Corps needs to provide evidence (*e.g.*, an expert opinion or testimony regarding prior management practices) that past *silviculture* (not just previous harvesting) actually did occur at Cypress Lake.

**B. Future Regeneration**

The parties agree that to be "on-going" silviculture within the Corps's regulation, the FMP needs to reasonably assure future regeneration of the forest. Doc. # 37 at 10; doc. # 43 at 16, 17 n. 11. The parties disagree over what methods will actually achieve that result post-harvest, given the inundated conditions of Cypress Lake.

It is not the province of this Court to choose between different viable theories of forest regeneration. It must only "consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Bowman Transp., Inc.*, 419 U.S. 281, 285 (1974). To that end, "[a]gency actions must be reversed as arbitrary and capricious when the agency fails to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Sierra Club v. Martin*, 168 F.3d 1, 5 (11th Cir.

8

1999) (quotes omitted; citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Here, the SELC presented the Corps with information showing that cypress trees and water tupelo in inundated conditions would not regenerate via coppice stump sprouting alone. Doc. # 37, AR 043-046. Part of this information included an EPA Region 6 letter indicating the need for more aggressive regeneration techniques in flooded conditions based on experiences in Louisiana. *Id.*, AR 048-050.

The Corps clearly considered these materials, as evidenced by its subsequent contact and meetings with GFC and EPA on the regeneration issue. Doc. # 43, AR 033, 038, 053. More importantly, the Corps asked the GFC to consult the Cypress Lake owners about modifying their FMP to "assure regeneration," then submit a letter expressing its opinion on the FMP's acceptability. *Id.*, AR 053. Apparently the GFC performed its task because a new FMP was submitted adding new requirements to assure regeneration -- (1) trees harvested one foot above high water mark to insure regeneration via coppice stump sprout; *and* (2) the water level will remain down until sprouting is at least 12 inches above the high water mark. Doc. # 43, AR 028. The GFC then submitted its letter referencing the second FMP and considered the regeneration difficulties documented in Louisiana:

> According to available literature and recent field observations in Louisiana and Florida, gum and cypress trees will regenerate naturally by *seed and coppice from stump sprouts*. [K]eeping the water level down, until such time this expected *seed and coppice regeneration* is twelve inches above the normal high water level, should be sufficient to meet the ongoing forestry definition and exemption.

Doc. # 37, AR 057 (emphasis added). The GFC's opinion letter even added the necessity of seed regeneration (which was not part of the FMP) and highlighted the importance of a lowered water level.

Shortly after this letter was provided, the FMP was changed again, *deleting* the water level requirement (never addressing the seed regeneration referenced in the GFC's letter) and simply adding that GFC will periodically monitor the site after harvest. *Id.*, AR 030. The Corps subsequently made its Exemption Determination based on this FMP.

But the Corps never explains its decision in the AR. Not once is there a justification for why the concerns about regeneration in Louisiana and Florida do not apply in Georgia. The Corps never states why the FMP was changed, nor why it believed that the conditions for likely regeneration addressed in the GFC letter were not necessary in this situation.

Instead, the Corps summarily concluded in its letters to Cypress Lake's owners and the SELC that natural regeneration through stump sprouting would occur. The letter states, "It is the opinion of the [GFC] that if harvesting is conducted in accordance with this plan, natural regeneration of the site through stump-sprouting should occur." Doc. # 37, AR 133. Yet, the AR shows no such opinion, only a GFC opinion with additional requirements to assure regeneration that was based on an *earlier*, *superseded* FMP. *Id.*, AR 057. And simply adding that the GFC will monitor the site post-harvest does not reasonably assure that regeneration will occur under the currently chosen FMP methods as required by the Corps's regulations.

9

The AR does provide a summary of a site visit conducted by the Corps with GFC and EPA in which they agreed the trees would regenerate through stump sprouts. But that is simply a conclusory assertion and thus it is insufficient. Doc. # 43, AR 128. Furthermore, at that site visit the EPA represented that it would send more information regarding its opinion on this proposal. Yet, the Corps did not wait for that information before making its decision. *Id.*

Nor did the Corps articulate why that information was unnecessary to its decision. In fact, Welborn's post-Corps-decision declaration merely states in conclusory fashion that the Corps's statement "that the trees would regenerate through stump sprouts" was accurate. Doc. # 43 at 50. This is contradicted by the EPA's declaration that it would send more information regarding its opinion but was unsure when it would be provided. Doc. # 43, AR 128. The fact that the information was not readily available reflects uncertainty on EPA's part. Welborn could easily have quieted that incertitude by explaining what the "additional information" referenced was, or why it was not necessary to the Corps's decision. Or, to be even more helpful, Welborn could have simply explained why the trees would regenerate through stump sprouting alone. Yet, that was not done.

The Corps failed to articulate in the AR why simply cutting the trees one foot above the high water mark will reasonably assure regeneration through coppice stump sprouting. Nor does the Corps explain why the GFC's opinion letter was not followed. Again, "[a]gency actions must be reversed as arbitrary and capricious when the agency fails to examine the relevant data and *articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.*" Sierra Club, 168 F.3d at 5 (11th Cir. 1999) (emphasis added).

The Court does *not* find that Riverkeeper's method of regeneration is correct and the Corps's determination was wrong. But because the Corps failed to explain its decision, and made no rational connection between the facts in the AR and the choice it made, its Exemption Determination must be reversed as arbitrary and capricious.

### C. CWA's Recapture Provision

Riverkeeper also contends, alternatively, that the Corps arbitrarily and capriciously refused to apply the CWA's "recapture" provision to the proposed activity in this case. Doc. # 37 at 14. That provision "recaptures" an exempted activity (thus, it "un-exempts" an exempted activity and makes it subject to the CWA) when (1) the discharge is incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject; and (2) the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced. 33 U.S.C. § 1344(f)(2); *see supra* n. 3.

So if a landowner's FMP proposes "discharge" or "flow" activities described in (1) and (2), the Corps would be obliged to consider whether the CWA's recapture provision would apply. Here, Riverkeeper bases its recapture argument on the landowner's need to substantially reduce the water level of Cypress Lake -- in order to assure tree regeneration. Doc. # 37 at 14. Yet, the landowner's FMP upon which the Corps made its Exemption Determination contained no water level requirement. Thus, this issue is moot.

## IV. CONCLUSION

Based upon the Administrative Record in this case, the Court finds the Defendants acted arbitrarily and capriciously in its determinations. Thus, the plaintiff Ogeechee-Canoochee Riverkeeper, Inc.'s motion for summary judgment (doc. # 37) is *GRANTED*. The Defendants' motion for summary disposition (doc. # 43) is *DENIED*.

This __27__ day of May, 2008.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA